**UNITED STATES of America**

v.

**Daniel POULIN.**

**No. CR–08–50–B–W.**

United States District Court,
D. Maine.

Aug. 14, 2009.

Gail Fisk Malone, Office of the U.S. Attorney District of Maine, Bangor, ME, for United States of America.

David J. Van Dyke, Hornblower, Lynch, Rabasco & Van Dyke, St. Lewiston, Me, for Daniel Poulin.

### ORDER ON MOTION TO SUPPRESS

JOHN A. WOODCOCK, JR., Chief Judge.

The Court denies the Defendant's motion to suppress the substance of an Octo-

---

ber 27, 2006 telephone conversation between law enforcement officers and the Defendant, and information the Government later obtained as a consequence of that conversation.

## I. STATEMENT OF FACTS

### A. The Filings

On March 12, 2008, a federal grand jury indicted Daniel Poulin for production of child pornography, an alleged violation of 18 U.S.C. § 2251(a). *Indictment* (Docket # 1). On September 30, 2008, Mr. Poulin moved to suppress the October 27, 2006 conversation and derivative evidence. *Def.'s Mot. to Suppress* (Docket # 26) (*Def.'s Mot.*). The Government responded on April 8, 2009. *Mem. in Opp'n to Def.'s Mot. to Suppress* (Docket # 103) (*Gov't's Opp'n*). On April 17, 2009, the Court held an evidentiary hearing at which the Defendant called Steven Juskewitch, Mr. Poulin's former lawyer, and the Government called Stephen McFarland, a detective with the Hancock County District Attorney's Office, Patrick Kane, a lieutenant with the Hancock County Sheriff's Office, and Scott Kane, a deputy sheriff with the Hancock County Sheriff's Office.[1]

### B. Piecing Together the Sequence of Events

#### 1. The CDs Are Discovered

In the fall of 2006, Daniel Poulin lived in the town of Islesford on Little Cranberry Island, Maine with his girlfriend, Wendy R., and her children; Wendy's daughter, Nicole R., was a minor for some part of their cohabitation with Mr. Poulin. Mr. Poulin, Wendy, and her children lived in a cabin; nearby the cabin was a main house in which Catherine Scovill, Mr. Poulin's mother, lived. Ms. Scovill owned both properties. In late October, Wendy discovered a number of computer discs, which had fallen to the ground from cracks in a soffit of the main house. When Wendy viewed the discs, she learned they contained images of Nicole and of her in the bathroom of their shared premises in varying states of undress. The discs appeared to have been the result of surreptitious taping.

On October 25, 2006, Wendy, Nicole, and Nicole's boyfriend confronted Mr. Poulin about the discs and Wendy and Nicole took a set of house keys to their house from Mr. Poulin's boat. Wendy then contacted Richard Howland, the area constable, and the Hancock County Sheriff's Office about the discs; on October 26, 2006, Nicole also spoke to the Hancock County Sheriffs about the discs. Although the timing is not clear, at some point, Mr. Poulin contacted Steven Juskewitch, an Ellsworth attorney, and he and his mother, Catherine Scovill, met with Mr. Juskewitch in his office.

#### 2. The Officers Visit the Island

On October 27, 2006, Detective McFarland and Deputy Kane traveled by ferry to Little Cranberry Island to investigate. When they arrived, they were picked up by Wendy, who drove them to the residence of Ms. Scovill, Mr. Poulin's mother. Here, the sequencing becomes muddled, because the witnesses' memories are vague. Mr. Juskewitch recalled that his first conversations with the officers involved their desire to search the cabin. Apparently, Mr. Juskewitch was in touch with Mr. Poulin, who was not on the Island, because Mr. Juskewitch testified that Mr. Poulin was very concerned that if the officers searched the properties they would cause extensive damage. Mr. Poulin volunteered to come to the Island and

---

1. The Defendant also called Arlo West, a forensic expert, and Catherine Scovill, each of whom testified regarding matters relating to another pending motion.

assist them in their search to minimize potential damage. As Mr. Juskewitch explained it, the idea was that Mr. Poulin would be present with a hammer and other tools and if the officers asked him to take down a wall, he would do so. However, if this happened, Mr. Juskewitch said the officers agreed that there was to be no conversation about the case itself with Mr. Poulin. At this point, another concern was expressed. Word of the incident was leaking out to the Island residents and there was discussion about whether Mr. Poulin's presence on the Island would incite some of the inhabitants. The net result was that the officers agreed to talk to Mr. Poulin on the telephone to gain his assistance in searching the cabin. After some further discussion, Mr. Juskewitch allowed the officers to talk directly to Mr. Poulin over the telephone without his listening in; however, as Mr. Juskewitch recalls, he had an agreement with the officers that they were not to discuss the case itself.[2]

### 3. The Poulin Telephone Call

The transcript of the October 27, 2006 telephone call confirms the substance of what led to the call. After the parties identified themselves, the following exchange took place:

*McFarland:* Steve Juskewitch has called us, and told us that, ahh, that you were giving us consent, uhh, to let us search for certain things on ahh, at your mother's property?

*Poulin:* Yes.

*McFarland:* Okay, does she know this?

*Poulin:* Yes.

*McFarland:* Okay, and uhh, I guess you've offered to help ahh, point us in, in certain locations.

*Poulin:* Yeah, I would, if I was not umm, ashamed to show my face out there, I would come out, and take them out, and give them to you, but,

*McFarland:* Yeah, I, I think it would be better over-all, if we tried to do it over the phone actually. Do you think that's possible?

*Poulin:* Yes, I do.

The officers and Mr. Poulin then engaged in a detailed discussion about where the hidden cameras were located in the bathroom of the cabin and the location of other evidence, such as the CDs, a computer, and a briefcase. Mr. Poulin also made a number of statements to the officers that could be construed as admissions of guilt.

## II. THE MOTION

### A. Mr. Poulin's Position

Mr. Poulin says that the statements the investigators obtained from him during the October 27, 2006 telephone call were not voluntary and must be suppressed. *Def.'s Mot.* at 2. He claims that the law enforcement officials and Mr. Poulin's then attorney entered into an agreement, which expressly limited the scope of the telephone conversation, but that the law enforcement officials instead engaged him in a conversation that ran far afield from the narrow, agreed-upon scope. *Id.* at 2–3. He asks that the Court suppress the substance of the conversation, except for information relating to the locations of cameras hidden within the Poulin cabin.

### B. The Government's Position

After demonstrating that a number of potential grounds for suppression are inapplicable, such as violation of the right to counsel or failure to give a *Miranda* warning before a custodial interrogation, the Government says that the only basis upon

---

**2.** Although it is not entirely clear, it appears that the officers were communicating with Mr. Poulin's cell phone through a land-based network at the Sheriff's Office, which recorded the conversation, and Mr. Juskewitch could not be patched into the call.

which the conversation could conceivably be suppressed, involuntariness, has not been demonstrated here. *Gov't's Opp'n* at 4–10.

## III. DISCUSSION

Having listened to the audiotape of the October 27, 2006 telephone conversation, read the transcript of the conversation, and heard Detective McFarland testify about the conversation, the Court readily concludes that Mr. Poulin's statements were not coerced and were knowingly and voluntarily made. The Court bases this conclusion on the following observations. First, the entire non-custodial exchange between Detective McFarland and Mr. Poulin was non-interrogative and extremely low key. Detective McFarland never raised his voice during the call, never even remotely threatened Mr. Poulin, never made promises of leniency, and spent the vast bulk of the time listening to Mr. Poulin's description of where he hid the cameras and how to extract them from the walls with minimal damage. Second, before the call, Detective McFarland received Mr. Poulin's attorney's permission to make the call, and during the call, when Attorney Juskewitch called Mr. Poulin, Detective McFarland readily allowed him to break off and speak with his attorney. Third, after speaking to his attorney, Mr. Poulin voluntarily returned to the call and re-entered the conversation.

Fourth, Detective McFarland expressly told Mr. Poulin that the conversation was not a formal interview, and if an interview was necessary, they would work through his attorney. Fifth, it was Mr. Poulin who volunteered his own statements about his complicity and commonly his statements were non-responsive and sometimes spontaneous.[3] Sixth, Mr. Poulin was miles away from Detective McFarland during the entire conversation. At any time if Mr. Poulin had wished to end the conversation, he could simply have hung up.

In these circumstances, the Government has easily met its burden to demonstrate that the Defendant's statements pass constitutional muster. The Court can find "virtually no evidence tending to show that his statements were coerced, compelled, or involuntary. The record reveals no physical or psychological pressures that could override the defendant's will, rather, it shows that the statements were the product of a rational intellect and a free will." *United States v. Lawrence*, 889 F.2d 1187, 1189 (1st Cir.1989) (citations and internal quotations omitted). The "totality of the circumstances" compels the conclusion Mr. Poulin's statements during the October 27, 2006 telephone conversation were voluntary. *United States v. Duarte*, 160 F.3d 80, 81 (1st Cir.1998); *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir.1990).

---

**3.** An example is the following exchange:

*McFarland:* So ahh, we're just taking it a step at a time, and the first step is just trying to collect ahh, the things that are out there, just to make sure we've got everything.

*Poulin:* And I understand that sir. I, I don't know you, and I don't know who you are. I'm not running from this.

*McFarland:* No, I, wou, I, ahh. That's pretty evident.

*Poulin:* I, umm, would have stayed out there, and done what I could to apologize, and make amends that night, and, you know I, I, I didn't share this with anybody. I didn't show it to anybody. I didn't do anything like that, umm. I'm not proud of it at all, and there are no minors. Well, she was a minor through a lot of it, but it's not a little girl thing. If you've seen this girl, you know that she is a very attractive, and well developed girl, and I'm not a pedophile.

Mr. Poulin's statements here were not even in response to a question, much less an interrogation.

## IV. CONCLUSION

The Court DENIES the Defendant's Motion to Suppress (Docket # 26).

SO ORDERED.